1

2

3

4

5

6            UNITED STATES DISTRICT COURT

7           NORTHERN DISTRICT OF CALIFORNIA

8

9    ANDREA C. ORTIZ,

10            Plaintiff,                    No.  C  07-4148  WDB

11        v.                               **ORDER**

12    THE COMMISSIONER OF SOCIAL
      SECURITY ADMINISTRATION,

13

14            Defendant.
      _____/

15

16

17                        INTRODUCTION

18        On December 18, 2007, Plaintiff Andrea C. Ortiz moved for summary judgment,

19   seeking judicial review of a final decision by the Commissioner of Social Security finding

     that she was not disabled and denying her Supplemental Security Income ("SSI") benefits.

20   Defendant, the Commissioner of Social Security, opposed Plaintiff's motion and filed a

21   cross-motion for summary judgment on February 6, 2008, asking the Court to affirm the

22   Commissioner's final decision.  Plaintiff replied on February 25, 2008.  The matter then was

23   deemed submitted for decision by this court without oral argument, pursuant to Civil Local

24   Rule 16-5.  After careful review and consideration of the record and the papers submitted,

25   the court hereby DENIES defendant's cross-motion for summary judgment and GRANTS,

26   in part, Plaintiff's request for relief by VACATING the Commissioner's decision and

27

28

                                    1

1  REMANDING the action to the Commissioner for further administrative proceedings
2  consistent with this Order.[1]

3  ## PROCEDURAL BACKGROUND

4  Plaintiff applied for SSI benefits on March 5, 2002, alleging that she was disabled as
5  of October 30, 1986, due to grand mal seizures.  On July 18, 2003, in another Disability
6  Report, and in her December 11, 2003, Reconsideration Report, Plaintiff added that her
7  disability was based also on a diagnosis of Bipolar II.   Plaintiff's request for benefits was
8  denied initially and on reconsideration.  Plaintiff then requested and received a hearing before
9  an Administrative Law Judge ("ALJ").  On November 8, 2005, the hearing was held before
10 the Honorable Donald F. Rector.   Ms. Ortiz testified at the hearing.  She was accompanied
11 by legal counsel, William Galvin.  A vocational expert ("VE"), Jeffrey Malmuth, also
12 testified.  After the hearing, Judge Rector issued a written decision, finding that Plaintiff was
13 not and had not been disabled as defined by the Social Security Act and applicable
14 regulations, and denying her request for SSI benefits.

15 Plaintiff then appealed to the Social Security Administration's Appeals Council,
16 asserting that the ALJ failed to give sufficient weight to the medical treatment records
17 showing severe mental impairments, and that the ALJ's adverse credibility finding was not
18 based on the requirements of the Social Security regulations.  On April 13, 2007, the Appeals
19 Council determined that there was no basis for review, and Judge Rector's decision became
20 the final decision of the Commissioner of Social Security in Plaintiff's case.  On August 13,
21 2007, Plaintiff filed a complaint in federal court seeking review of the decision.  Both parties
22 subsequently consented in writing to proceed before a United States Magistrate Judge.

23

24

---

25    [1]  The vocabulary through which we articulate our reasoning about the issues we address in this
   opinion is largely the product of legal constraint – but we hope the ALJ whose findings are the subject
26 of this proceeding understands that we recognize how difficult his job is and what a huge volume of
   work he and his colleagues confront.  We intend our opinion to serve as one component in a larger,
27 multi-layered process whose design acknowledges limitations under which each level of the system of
   civil justice must work – a larger process that is designed to improve the likelihood that, in the end, the
28 system will yield outcomes that conform to Congress' mandates.

STANDARD OF REVIEW

The district court may set aside the Commissioner's denial of disability insurance benefits only when the ALJ's determinations are based on legal error or are not supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999) (citations omitted). "Substantial evidence" means more than a scintilla but less than a preponderance; it is such evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). "If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098, quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992).

DISCUSSION

A. APPLICABLE LAW - STEPS TO DETERMINING DISABILITY

An SSI claimant is considered disabled if (1) she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A), (B).

The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act. 20 C.F.R. § 404.1520. The five steps are:

> **Step 1.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. See 20 C.F.R. § 404.1520(b).

> **Step 2.** Is the claimant's impairment severe? If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. See 20 C.F.R. § 404.1520(c).

**Step 3**. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "disabled " and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. See 20 C.F.R. § 404.1520(d).

**Step 4.**  Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "not disabled" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(e).

**Step 5.** Is the claimant able to do any other work? If not, then the claimant is "disabled " and therefore entitled to disability insurance benefits. See 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "not disabled" and therefore not entitled to disability insurance benefits. See 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "disabled " and therefore entitled to disability benefits.

*Tackett*, 180 F.3d at 1098-99.  The burden of proof is on the claimant as to steps one to four.

*Id.* at 1098.  At step five, the burden shifts to the Commissioner.  *Id.*

B.    THE ALJ'S DECISION -- APPLICATION OF THE FIVE-STEP PROCESS

Applying the five-step evaluative process, the AJL first found that Plaintiff had not performed substantial gainful activity since March 5, 2002, the date Plaintiff filed for social security income. Next, the Judge found that Plaintiff had a "severe seizure disorder and a personality disorder NOS."[2]  The wording of this conclusion does not make it clear whether Judge Rector found that only the seizure disorder was "severe" or whether he concluded that both the "seizure disorder" and the "personality disorder NOS" were "severe."  Because the ALJ proceeded to address, separately, the status and implications of both of these disorders

---

[2] "NOS" is a short-form for the diagnosis of "not otherwise specified," which, as applied in this context, is for a category of disorders of personality functioning that do not meet criteria for any specific personality disorder. *See* American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 4th Ed., Section 301.9 (2000).  An example of a Personality Disorder NOS is a disorder with the presence of features of more than one specific personality disorder that do not meet the full criteria for any one personality disorder, but that together cause clinically significant distress or impairment in one or more important areas of functioning.  *Id.*

4

in the subsequent stages of his opinion, it appears that he intended to attach the label "severe" to both disorders.  He never suggested that he continued (in stages three through five of his analysis) to assess the implications of the personality disorder only because, as a matter of legal theory, even as a minor player in the applicant's situation the personality disorder might work in combination with the severe seizure disorder to produce a net negative impact on Ms. Ortiz' capacities that would entitle her to the benefits she sought.

Under step three,  the ALJ found that Plaintiff's symptoms did not approach in severity the criteria listed in 20 CFR Part 404, Subpart P, Appendix 1, sections 11.02 or 11.03 describing seizures, or in section 12.08, describing personality disorders.  Given that determination, the ALJ was required to proceed to step four, where he determined Plaintiff's "residual functional capacity," or "RFC."

The ALJ found that Plaintiff's RFC did not include exertional limitations.  However, given Plaintiff's severe seizure disorder, the ALJ found that Plaintiff's RFC should include limitations in her exposure to unprotected heights and unprotected moving machinery, and that she should not be driving.  With respect to the mental RFC, given Plaintiff's personality disorder NOS, the ALJ concluded that Plaintiff can "only frequently, not constantly, respond appropriately to supervision, co-workers and unusual work situations."

Crediting testimony from the vocational expert, the ALJ then concluded that these residual capacities did not enable Plaintiff to do work she had done in the past as a home care worker, because that work "requires more than frequent ability to respond appropriately to supervision, co-workers, and unusual work situations."  Accordingly, the ALJ was required to proceed to step five, where he assessed whether the Social Security Administration met its burden to show that Plaintiff was able to do *other* work available in  significant numbers in the national economy consistent with Plaintiff's medically determinable impairments, functional limitations, age, education and work experience.

Again crediting the testimony of the vocational expert — based upon a hypothetical posed to the expert about Plaintiff's RFC — the ALJ found that Plaintiff was able to perform jobs existing in significant numbers in the regional and national economy, including, for

example, becoming an assembler of small products or a housekeeper/cleaner.  Accordingly, because he found that Plaintiff was still capable of working, the ALJ concluded that Plaintiff was <u>not</u> disabled within the meaning of the Social Security Act and, thus, that Plaintiff should not receive SSI benefits.

As we will explain, below, after reviewing the record in its entirety, we have determined that Judge Rector's treatment of the evidence fell into three categories: (1) sources from which he credited all the evidence, (2) sources from which he credited and relied on some of the evidence – while not crediting or ignoring other evidence from the same source, and (3) sources from which, in essence, he credited nothing.  We describe the principal evidence in the paragraphs that follow.

Judge Rector noted an April 2002 report from consultative neurologist Daniel Katzenberg, M.D., who opined that Plaintiff needed seizure precautions, but had no other physical restrictions.

The ALJ also noted an October 2003 report from consultative neurologist James Lasker, M.D., who also opined that Plaintiff's seizures would prohibit her from driving, or working at heights or around dangerous machinery.  Dr. Lasker noted that Plaintiff's last seizure had been one year before.  Dr. Lasker also noted that Plaintiff's mood appeared to be somewhat labile and that she was somewhat diffuse at times in her answers to questions.  Dr. Lasker found no other physical limitations for Plaintiff, nor any objective basis for her reported symptoms of weakness, dizziness, or headaches.

The material of record includes an October 2003 psychological assessment report from Dr. April Young, Ph.D.,  a consulting psychologist for the California Department of Social Services, who met with Plaintiff for a psychological evaluation.  Dr. Young also gave the Rey 15 Item Memory Test, and the Wechsler Adult Intelligence Scale - III test to Plaintiff.  Dr. Young wrote a comprehensive report, which included her diagnostic impressions that Plaintiff has a Mood Disorder NOS, a history of substance abuse, Panic Disorder (by report), Personality Disorder NOS, and that  Borderline Intellectual Functioning needed to be ruled out.  Given these diagnoses and the tests performed, Dr. Young opined that Plaintiff's ability

6

to relate to others, including co-workers, supervisory personnel, and the general public in an appropriate manner was impaired. Dr. Young also found that Plaintiff evidenced concentration difficulties, and that her ability to perform complex tasks was limited by her cognitive functioning, and further impaired by her emotional functioning. More positively, Dr. Young opined that Plaintiff's ability to understand and follow instructions, and to maintain the appropriate level of pace and persistence necessary to perform a one or two-step simple repetitive task was unimpaired.

The record before the ALJ also contained documents from Plaintiff's treating psychotherapist, Dr. Patsy Phillips, Ph.D., from July 6, 2004 to September 14, 2005. Based on an initial assessment on July 6, 2004, Dr. Phillips diagnosed Plaintiff with Bipolar II disorder.[3]  In treatment notes from October 14, 2004, Dr. Phillips wrote that she referred Plaintiff to a physician "to be evaluated for psychotropic medications to stabilize her mood." (Tr. at 680).  In addition to Bipolar II Disorder, Dr. Phillips diagnosed Plaintiff with Borderline Personality, Closed Head Injury and seizures, Relationship Conflict, and determined that Plaintiff fell between 41-50 on the Global Assessment of Functioning Scale ("GAF").  Under the GAF, a person assessed between 41-50 can be expected to have "serious symptoms (e.g., suicidal ideation) OR serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 4th Ed., p. 34 (2000).

Dr. Phillips wrote that Plaintiff's primary presenting problem was a Borderline Personality, and that Plaintiff's secondary presenting problems were medical issues, paranoid ideation, depression, anxiety, and anger management.  Dr. Phillips noted that Plaintiff's strengths are "good personal care habits, stable living environment, supportive family," and that Plaintiff's weaknesses are that she is "defensive, distrustful, [has] intellectual deficits, lacks insight." (Tr. at 695).

---

[3]  The essential feature of Bipolar II Disorder is a clinical course that is characterized by the occurrence of one or more Major Depressive Episodes accompanied by at least one Hypomanic Episode. *See* American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 4th Ed., Section 296.89 (2000).

Dr. Phillips's treatment notes reveal that Plaintiff was quite distressed about her seizure disorder, which Plaintiff says developed after she was battered and suffered a head injury in 1986. During the course of their treatment, Plaintiff admitted to Dr. Phillips that she would forget to take her seizure medication (Dilantin) at times but on several occasions also noted that she had been compliant with taking her medication. Plaintiff also was quite distressed about some of her previous work experiences, where she felt she had been treated unfairly and terminated unfairly. Plaintiff described being fearful about going to work. Dr. Phillips also noted that Plaintiff was very involved in her church, and regularly attended church functions and taught Sunday School. Plaintiff described to Dr. Phillips altercations with other church members but in later sessions reported that things were going well at church. Plaintiff told Dr. Phillips that she had a son who had died, and that Plaintiff did not want to be tortured by her son's death.

Dr. Phillips's notes reported "some progress" and "completed" for Plaintiff in many areas of emotional functioning. In notes from sessions in later stages of Plaintiff's treatment, Dr. Phillips wrote that Plaintiff's emotional lability had been reduced, and that Plaintiff reported less frequent incidents of emotional reactivity. Notably, however, in the area of "decreas[ing] the number and duration of angry outbursts," Dr. Phillips reported "significant regression" by Plaintiff." (Tr. at 693).

The record developed for the proceedings before the ALJ also contained a February 2005 report signed by Dr. Sabine Steegers, M.D., that was based on Plaintiff's visit to the emergency room at Sutter Delta Medical Center following a seizure. The report stated that Plaintiff had epilepsy and that the current seizure problem was likely caused by noncompliance with taking Dilantin — the medication prescribed to Plaintiff to help control her seizures.

Judge Rector also relied upon the testimony of a vocational expert, Jeffrey Malmuth. As we explain in detail in Part 3 below, the vocational expert's testimony consisted primarily of answers to somewhat confusing questions from the ALJ about the various jobs that would be available to a hypothetical claimant with a particular RFC. In the first hypothetical, the

ALJ asked the vocational expert to consider a situation where an employee's RFC would enable the employee to get along with supervisors and co-workers for 2/3 of the work week, but "a third of the work week she may have a problem getting along with supervisors, coworkers, and others." (Tr. at 796). After hearing this hypothetical, the vocational expert stated that: "[i]f it's occasional, and it's predictable that she will have these problems to the extent that you just indicated . . . then I do believe she would not be able to maintain work." (Tr. at 797). The ALJ then posed a second hypothetical to the vocational expert in which the claimant could be expected only to occasionally have problems getting along with supervisors, coworkers, and others, and these problems may only "occasionally occur weekly." (Tr. at 800). After hearing this modified set of assumptions, the vocational expert concluded that Plaintiff would be able to carry out jobs that required her mainly to work with things as opposed to people. (Tr. at 799). Specifically, the vocational expert advised that he believed Plaintiff could do light, unskilled work, and that the Occupational Employment Statistics Quarterly identified that there are 1,090 light, unskilled jobs in the Alameda, Contra Costa, Marin and San Francisco counties for the first quarter of 2005. (Tr. at 801). The vocational expert also advised that Plaintiff could do assembly-type jobs, like an assembler of small products (2,351 such jobs were available in the Bay Area as of the first quarter of 2005), or jobs such as a housekeeper or a cleaner in commercial or institutional settings (2,829 of these kinds of jobs appeared to be available in the Bay Area as of the first quarter of 2005). (Tr. at 802).[4]

The ALJ also reviewed but *rejected* two reports by consultative examiner Dr. Dwight Murray, Ph.D, a licensed psychologist, Fellow and Diplomate, ABMP, FACAPP. Following a comprehensive examination and testing of Plaintiff in March 2003, Dr. Murray's diagnostic impressions were that Plaintiff had Bipolar II, a Borderline Personality Disorder, a Generalized Anxiety Disorder, and a Personality Disorder NOS with Schizoid, Epileptoid, and

---

[4] At one point during the hearing, the vocational expert advised that Plaintiff could do work in food preparation and assembly. After the ALJ pointed out that Plaintiff could do only unskilled work, the vocational expert noted that food assembler was "semi-skilled" and, thus, not appropriate for Plaintiff.

Paranoid Features.  Dr. Murray also diagnosed Plaintiff with a Cognitive Disorder NOS with Seizures and a Reading Disorder.  Given his diagnostic impressions, Dr. Murray opined that he "do[es] not regard Ms. Ortiz as capable of self-support.  She is too emotionally labile, too anxious, and is generally an unstable individual.  She would have great difficulty focusing, sticking to task, etc.  Consequently, disability benefits are recommended." (Tr. at 366).  Dr. Murray also recommended that Plaintiff be referred to a psychiatrist to be reviewed for medication for a Bipolar condition.

On a Mental Residual Functional Capacity Assessment form dated May 2003, Dr. Murray indicated that Plaintiff would have "Marked Limitation" with (a) understanding, remembering, and carrying out technical and/or complex job instructions; (b) dealing with the public; (c) performing activities within a schedule and maintaining regular attendance; (d) completing a  normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and (e) responding appropriately to changes in a work setting.  Dr. Murray also indicated that Plaintiff was "Not Significantly Limited" in understanding, remembering and carrying out very short and simple job instructions, but that Plaintiff would have "Moderate Limitation" in (a) understanding, remembering and carrying out detailed but uncomplicated job instructions; (b) interacting appropriately with supervisors/coworkers; and (c) maintaining concentration, attention, and persisting in a task.  (Tr. at 298).

Dr. Murray again examined Plaintiff in August of 2004.  His diagnoses remained the same, and he continued to recommend that Plaintiff receive disability benefits.  Dr. Murray also noted in his second report that Plaintiff had not followed his prior recommendation to seek psychiatric help, and that he strongly recommended again that she see a psychiatrist to stabilize the Bipolar condition.  Dr. Murray ended the report by noting that Plaintiff eventually could be "considered for return to the work market, assuming that she benefits from the psychiatric help," but that "her learning problems are going to have to be taken into account," and that "she cannot multitask, because she becomes too confused."  (Tr. at 614).

1     On grounds he never specified, the ALJ rejected Dr. Murray's reports and opinions as

2     being "speculative, imagined, and inconsistent with the rest of the medical evidence of

3     record." (Tr. at 21).

4     Also in the record but <u>not</u> mentioned by the ALJ in his opinion are three State Social

5     Security Disability Determination and Transmittal Reports, a Mental RFC Assessment by Dr.

6     Robert E. Lee, M.D., and a Psychiatric Review Technique by Drs. Lee and Peskin.  The first

7     Disability Determination report, signed by Dr. Edward Gallagher, M.D., dated June 2002,

8     indicates that Plaintiff's primary diagnosis is Epilepsy (major motor seizures).  This report

9     appears to be a summation of Dr. Gallagher's findings in a related Physical Residual

10    Functional Capacity Assessment Report of the same date.  The second report, signed by Drs.

11    Robert Lee, M.D., and Sandra Battis, M.D., dated October 2003, indicates that Plaintiff's

12    primary diagnosis is Epilepsy (major motor seizures), and that her secondary diagnosis is

13    Affective (mood) Disorders.  The third report, signed by Drs. John Chokatos, M.D., and P.

14    Peskin, M.D., dated March 2004, also indicates that Plaintiff's primary diagnosis is Epilepsy

15    (major motor seizures), and that her secondary diagnosis is Affective (mood) Disorders.

16    Similarly, Drs. Lee and Peskin, who appear to have evaluated only the evidence on file

17    and never to have examined Plaintiff, report on the Psychiatric Review Technique that

18    Plaintiff has an Affective Disorder NOS, and a Personality Disorder NOS that would result

19    in Moderate Functional Limitations in daily living, social functioning, concentration,

20    persistence, and pace.  (Tr. at 603-606).  Dr. Lee also reports in a Mental RFC Assessment

21    that Plaintiff has moderate limitation in the ability to understand and remember detailed

22    instructions; ability to concentrate for extended periods; ability to work in coordination with

23    others; ability to interact with the general public; the ability to get along with coworkers; and

24    the ability to accept instruction and respond appropriately to supervisors.  (Tr. at 572).  Dr.

25    Lee reported in this same assessment that Plaintiff is not significantly limited in the ability to

26    complete a normal workday and workweek without interruptions from psychologically based

27    symptoms.  (Tr. at 572).

28

1   The record also contains a Daily Activities Questionnaire, dated July 25, 2003,
2   completed by Ms. Michelle Roberson, Plaintiff's personal friend, who stated that she sees
3   Plaintiff, on average, two to three times per week.  As to Plaintiff's mental functioning, Ms.
4   Roberson reported, in part, that Plaintiff "over concentrates and go[es] from one extreme to
5   the next where conversation is in play," and that Plaintiff's memory had been damaged by the
6   seizure disorder. (Tr. at 144).  Ms. Roberson also reported that she believed Plaintiff had been
7   fired from two prior jobs because of Plaintiff's inability to "stay on task" and because of her
8   tendency to prolong tasks.  (Tr. at 144).  The ALJ did not mention Ms. Roberson's
9   questionnaire in his opinion, and it appears he gave no weight to its contents.

10   Finally, the ALJ considered, but declined in significant measure to credit, the testimony
11   given by Plaintiff.  She testified that she intends to take her Dilantin medication for seizures
12   and that most of the time she does, but that sometimes she misses a few days; that she sees a
13   therapist (Dr. Phillips) once a week, and that they are working on the difficulty Plaintiff has
14   interacting with other people; that since she began treatment with Dr. Phillips her relationships
15   with her family have improved; that since she has been seeing Dr. Phillips she has not
16   entertained the idea of getting a job, and that she does not believe she is capable of going into
17   the work place on a regular basis because of the rigor that is required; and that she has
18   difficulties with supervision — the problem for which she was terminated at her last two jobs.

19   When asked whether there was anything wrong with her mentally or emotionally,
20   Plaintiff testified that when she was four months pregnant she felt movement in her head and
21   unusual pains, and that this may have been because of the seizures.  Plaintiff believes her
22   seizures are caused by a trauma to her head in 1986.  Plaintiff testified that she has a routine
23   that consists of going to church in the morning, and then shopping; she is unable to keep up
24   her house in the way she used to, and she is ashamed of the condition of the house.  Plaintiff
25   does not drive — her license was taken away because she was having seizures.  Plaintiff also
26   testified that she has friends, but that most of them are in San Francisco, where she used to
27   live, because she has had  several incidents in her current social circle at church that have led

28

12

to problems with those friendships.  Plaintiff also testified that her twenty-six year old son had been shot and killed four years before the hearing.

The Judge found that Plaintiff's subjective complaints about the severity of her symptoms were not credible.  He noted that Plaintiff had difficulty getting along even with her health counselor, that Plaintiff had not been fully compliant with instructions about taking her medications, and that Plaintiff's symptoms seemed to be under control when she takes her medications, as she reported she was doing at the time of the hearing.  The ALJ also noted that the treating therapist reported that Plaintiff had a sense of entitlement to constant help.   In sum, the ALJ concluded that "the claimant's testimony was not credible regarding the severity of the symptoms."  (Tr. at 23).

C.    REVIEW OF THE ALJ'S DECISION

Plaintiff raises three issues for review:   (1) whether the ALJ improperly failed to find that Plaintiff had a mood disorder by ignoring the medical opinion of examining psychologist Dr. Dwight Murray and important aspects of the opinions of examining psychologist Dr. April Young and treating psychologist Dr. Patsy Phillips; (2) whether the ALJ improperly discredited Plaintiff's report of her symptoms, and ignored lay witness evidence submitted by Plaintiff's personal friend, Michelle Roberson; and (3) whether the Commission sustained its burden of proving at Step 5 that Plaintiff was capable of doing jobs that exist in significant numbers in the national economy.

1.    *The ALJ Did Not Provide Specific, Legitimate Reasons for Rejecting the Opinion of Dr. Murray and for Ignoring Key Aspects of the Opinions of Drs. Young and Phillips*

Plaintiff seeks review of the ALJ's rejection of the opinion of consulting examining psychologist Dr. Dwight Murray, and the ALJ's decision to ignore parts of the opinions of consulting examining psychologist Dr. April Young and treating psychologist Dr. Patsy Phillips. In particular, Plaintiff complains that while the ALJ found that Plaintiff was severely mentally impaired due to a personality disorder, the ALJ failed to find that she also was impaired due to a mood disorder, despite the fact that nearly every doctor who examined Plaintiff, including Doctors Murray, Young, and Phillips,  diagnosed Plaintiff with some type

13

1   of mood disorder.  Dr. Murray and Dr. Phillips diagnosed Bipolar II disorder, a subcategory

2   of mood disorders (*See* American Psychiatric Association Diagnostic and Statistical Manual

3   of Mental Disorders 4th Ed., p. 345 (2000)), and Dr. Young diagnosed Mood Disorder NOS.

4          Though the ALJ did not distinguish between Mood Disorders and Personality

5   Disorders in his opinion, and may actually have conflated the two disorders in his thinking,

6   the disorders are distinct and result in very different symptoms and outcomes. *See* American

7   Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 4th Ed.,

8   compare Section on Mood Disorders beginning on p. 345 with Section on Personality

9   Disorders beginning on p. 685 (2000).

10         The ALJ failed to address in any meaningful way the substantial evidence that plaintiff

11  had not only a "personality disorder N.O.S.," but also a "mood disorder."  Under well

12  established medical conventions, a "mood disorder" is an entirely different condition with

13  potentially much more disabling implications than a "personality disorder N.O.S."

14  Specifically, the ALJ failed to provide adequate reasons, and we have found none in the

15  record, for rejecting the conclusions of Dr. Murray, a consulting psychologist who examined

16  Plaintiff *twice* and completed two comprehensive reports and a Residual Functional Capacity

17  Assessment.  We similarly find no adequate reasons for ignoring the Mood Disorder NOS

18  diagnosis by Dr. Young, who conducted a complete psychological evaluation of Plaintiff and

19  administered well-known psychological tests.  Nor were there adequate reasons to reject the

20  Bipolar II diagnosis by Dr. Phillips, who was Plaintiff's *treating* psychologist for more than

21  a year.

22         The Ninth Circuit recently reaffirmed that, in an SSI case, "[t]he opinion of an

23  examining doctor, even if contradicted by another doctor, can only be rejected for specific and

24  legitimate reasons that are supported by substantial evidence in the record."  *Widmark v.*

25  *Barnhart*, 454 F.3d 1063,  1066 (9th Cir. 2006) (quoting *Lester v. Chater*, 81 F.3d 821, 830-

26  31 (9th Cir. 1995)).  The rule is even more stringent for a *treating* doctor:  the ALJ may reject

27  an uncontroverted opinion of a treating physician only for clear and convincing reasons.

28  *Magallanes v. Bowen*,  881 F.2d 747, 751 (1989); *see also*, *Orn v. Astrue*, 495 F.3d 625,

14

631-32 (9th Cir. 2007) (a treating physician's opinion must be given controlling weight if it is well-supported and not inconsistent with the other substantial evidence in the record). Moreover, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Id*. at n. 2 (quoting *Lester*, 81 F.3d at 831).

The ALJ did not follow this settled law.  Instead, in arriving at the conclusion that Plaintiff suffered only from a personality disorder —and not a mood disorder — and that Plaintiff's RFC enabled her to do light work that would only occasionally be hindered by her psychological symptoms, the ALJ  rejected outright the reports and assessments by Dr. Murray, a consulting physician for the DDS who *examined* Plaintiff <u>twice</u> and who diagnosed her with Bipolar II Disorder, Borderline Personality Disorder, Generalized Anxiety Disorder, and Personality Disorder NOS.  The <u>only</u> justification the ALJ provided for rejecting Dr. Murray's opinions was the unexplained and at least substantially erroneous assertion that Dr. Murray's findings were "speculative, imagined, and inconsistent with the rest of the medical evidence of record."  (Tr. at 21).

The ALJ rejected Dr. Murray's opinion, despite the evidence in the record from Dr. Phillips, Plaintiff's *treating* psychologist, who, <u>consistent</u> with Dr. Murray, also diagnosed Plaintiff with Bipolar II disorder and referred Plaintiff to a physician "to be evaluated for psychotropic medications to stabilize her mood."  (Tr. at 680).  Also <u>consistent</u> with Dr. Murray, Dr. Young diagnosed Plaintiff with Mood Disorder NOS.  Finally, even Dr. Lasker, one of the consultative neurologists  who examined Plaintiff, noted that Plaintiff's mood appeared to be somewhat labile and that she was diffuse at times in her answers to questions. It is difficult to understand how the ALJ arrived at his opinion that Dr. Murray's opinions were "speculative, imagined, and inconsistent with the rest of the medical evidence of record" when Dr. Murray's conclusions were based upon two full psychological evaluations of Plaintiff that

led to the same conclusions that were reached by nearly every other doctor who examined Plaintiff.[5]

Moreover, in finding that Plaintiff had a personality disorder but not a mood disorder (in the nature either of Bipolar II or Mood Disorder NOS), the ALJ selectively credited only parts of the opinions of Drs. Young and Phillips — while failing to offer any substantive reasons for rejecting these same doctors' conclusions that Plaintiff suffered from a mood disorder. At the hearing, the ALJ stated only that: Dr. Young "comes up with mood disorder, NOS. She also comes up with personality disorder, NOS, and I think that both of those are confirmed by Patsy [Phillips] . . . in terms of her treatment, so I'm going to focus on personality disorder." (Tr. at 790). The AJL provided no reasoning for his decision to "focus on personality disorder" and to ignore the diagnoses of mood disorder. Moreover, he offered no support whatsoever for his conclusory condemnation of Dr. Murray's finding that Plaintiff suffered from Bipolar disorder.

Working from this legally defective base, the ALJ proceeded to conclude that Plaintiff was capable of doing light, unskilled work and that she could "frequently, not constantly, respond appropriately to supervision, co-workers and unusual work situations." (Tr. at 22). It was this compromised conclusion about Plaintiff's RFC that subsequently formed the basis for the hypothetical the ALJ posed to the vocational expert to help the expert assess whether Plaintiff was capable of working in jobs other than those she previously had done. Given a RFC that enabled Plaintiff to "frequently, not constantly, respond appropriately to supervision, co-workers and unusual work situations," the vocational expert concluded that Plaintiff was able to work.

In sharp contrast, Dr. Murray's RFC Assessment found that Plaintiff was much more limited than the ALJ described. Dr. Murray stated that Plaintiff suffered "Marked Limitation" completing a normal workday and workweek without interruptions from psychologically

---

[5]    Reports from consulting, *nonexamining* physicians also noted that Plaintiff's diagnoses included an Affective (mood) Disorder. *See* Social Security Disability Determination and Transmittal Reports (Tr. at 28-29), and Psychiatric Review Technique signed by Dr. Robert Lee (Tr. at 603).

based symptoms; "Marked Limitation" performing at a consistent pace without an unreasonable number and length of rest periods; and "Marked Limitation" performing activities within a schedule and maintaining regular attendance (Tr. at 298). Indeed, every psychologist who *examined* or *treated* Plaintiff found significant mental problems that likely would substantially hinder Plaintiff's ability to work. Dr. Phillips assessed Plaintiff as between 41-50 on the Global Assessment of Functioning Scale, which indicates that Plaintiff would be expected to have "serious symptoms (e.g., suicidal ideation) OR serious impairment in social, occupational, or school functioning (e.g., no friends, **unable to keep a job**)." *See* American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 4th Ed., p. 34 (2000) (emphasis added). Dr. Young opined that Plaintiff's ability to relate to others, including co-workers, supervisory personnel, and the general public in an appropriate manner was impaired. Dr. Young also noted that Plaintiff had difficulty concentrating — and that her ability to perform complex tasks would be limited by her cognitive functioning and further impaired by her compromised emotional functioning. Only consulting physician Dr. Robert Lee, who apparently never examined Plaintiff, opined that Plaintiff was not significantly limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. Yet even Dr. Lee admitted that Plaintiff would suffer moderate limitations in many areas of functioning that are necessary for successful employment. (Tr. at 572).

The ALJ did not provide any sufficient reason for his rejection of the doctors' opinions that Plaintiff suffered from some type of mood disorder, or that Plaintiff's mental RFC was not as Dr. Murray opined. Immediately after noting that he had rejected Dr. Murray's conclusions, the ALJ wrote that "the most recent psychological evaluation reported that the claimant had quit her job in home care because she ate a termite. She was fired at her job at Sears for stealing." These assertions fail to provide any rationale for rejecting Dr. Murray's opinion that plaintiff suffered from a "mood disorder." Why eating a termite and stealing from an employer constitute evidence (medically acknowledged or otherwise) that a person does not suffer from a "mood disorder" completely escapes us. Absent a supported

1   line of reasoning to the contrary (which the ALJ did not provide), this conduct would seem
2   to support Dr. Murray's diagnosis, not to contradict it.

3          We note that there is some evidence in the record, in the form of documents from Dr.
4   Lee, that might lend support to the ALJ's findings.  The ALJ, however, mentioned nothing
5   about this evidence in his opinion or on the record during the hearing.  Moreover, and more
6   significantly, even if the ALJ had cited and discussed the evidence from Dr. Lee, that
7   evidence, as a matter of law, could not have served as a sufficient justification for rejecting
8   or ignoring Dr. Murray's findings.  This follows because there is nothing in the record to
9   suggest that Dr. Lee ever examined the Plaintiff.  He opined solely on the basis of documents
10  generated by others.  Dr. Murray, on the other hand, examined the Plaintiff twice, and, after
11  each such examination, produced a detailed, apparently medically well-reasoned report.  *See*
12  *Lester*, 81 F.3d at 831  ("[t]he opinion of a nonexamining physician cannot by itself constitute
13  substantial evidence that justifies the rejection of the opinion of either an examining physician
14  or a treating physician").

15         Under controlling Ninth Circuit precedents, the ALJ was required to set forth "specific
16  and legitimate reasons" for rejecting or ignoring Dr. Murray's finding that plaintiff suffered
17  from a "mood disorder" – and for ignoring or rejecting those parts of the opinions from Drs.
18  Phillips and Young that supported or concurred in Dr. Murray's finding. *See e.g.,  Widmark*,
19  454 F.3d at 1066-67.  By failing to satisfy these requirements, the ALJ committed legal error.
20  The ALJ also committed legal error by failing to provide the "clear and convincing" reasons
21  required to reject the uncontroverted opinion of  Dr. Phillips — Plaintiff's treating
22  psychologist. *See Magallanes*, 881 F.2d at 751.

23         Moreover, because the manner in which the ALJ evaluated the evidence resulted in the
24  ALJ's finding that Plaintiff could "frequently, not constantly, respond appropriately to
25  supervision, co-workers and unusual work situations" on the all-important question of
26  Plaintiff's work limitations — the basis for the hypothetical posed to the vocational expert in
27  the RFC analysis — the legal errors were critical to the ultimate determination of Plaintiff's
28  right to receive SSI benefits under step five of the five-step analysis and, thus, cannot be

characterized as "harmless."  *See e.g., Stout v. Commissioner*, 454 F.3d 1050 (9th Cir. 2006) (prejudicial errors are not harmless).  Indeed, as explained below in Section 3, there is good reason to believe that the vocational expert would have arrived at a different conclusion about Plaintiff's ability to work had he been told that Plaintiff's limitations in the workplace due to her psychological problems were more severe than in the modified version of the hypothetical posed to him.  *See* Tr. at 797.  Therefore, we must remand the action to the ALJ for him to reconsider the evidence in a manner consistent with this Order, and for him to re-assess under step five whether the Commission met its burden to prove that Plaintiff is capable of working in jobs that exist in significant numbers in the national economy.

2. *The ALJ Committed Legal Error by discrediting, without sufficient articulated cause, Plaintiff's Report of her Symptoms and by Ignoring Entirely Supporting Lay Witness Evidence*

Plaintiff also seeks review of the ALJ's adverse finding that "[Plaintiff's] testimony was not credible regarding the severity of the symptoms " (Tr. at 23), and of the ALJ's failure to consider supporting evidence about Plaintiff's symptoms and daily activities from her personal friend, Michelle Roberson.  Ms. Roberson reported that Plaintiff had difficulty with concentration and memory, and that Plaintiff had been terminated from her two prior jobs for inability to "stay on task" and because of her tendency to prolong tasks.  (Tr. at 144).  The ALJ did not mention Ms. Roberson's questionnaire in his opinion, so we are constrained to infer that he gave it no weight.

In general, and within certain boundaries, credibility determinations are the province of the ALJ.  "It is the ALJ's role to resolve evidentiary conflicts.  If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld."  *Allen v. Secretary of Health and Human Services*, 726 F.2 1470, 1473 (9th Cir. 1984), citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971); *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  Subject to some legal conditions, an ALJ has discretion not to accept a plaintiff's testimony about her subjective condition.  To justify discrediting the subjective evidence, however, the ALJ must articulate reasons or facts that are "sufficiently specific to

19

permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *See Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

The ALJ may consider at least the following factors when weighing the claimant's credibility:  reputation for truthfulness; inconsistencies either in the claimant's testimony or between testimony and conduct; daily activities; work record; and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (1997).

Moreover, in determining whether a claimant is disabled, an ALJ must consider lay witness testimony. *See Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir.1993). "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (internal citations omitted).

In this case, Plaintiff presented subjective testimony that she does not believe she is capable of going to work on a regular basis because of the rigor that is required.  (Tr. at 776). Plaintiff also testified that she feels she suffers abuse when she works, and that she has difficulties with supervision. (Tr. at 776-777). The ALJ articulated three reasons for discrediting Plaintiff's testimony:  (1) that she had difficulty getting along with her therapist; (2) that while she had not been fully compliant in the past with taking her medications, she now was in compliance and had her symptoms under control; and (3) Plaintiff's treating psychologist reported that Plaintiff felt she had an entitlement to constant help.

After a careful review of the entire administrative record, we conclude that, as a matter of law, these are insufficient reasons for discrediting Plaintiff's testimony.  We also conclude that the ALJ improperly ignored the supporting evidence provided by lay witness Michelle Roberson.

Plaintiff's testimony that she is unable to work because of the rigor required and because she often feels that she is abused and has difficulty getting along with supervisors is

entirely consistent with the medical evidence in the record (discussed at length above) from Drs. Murray, Young, and Phillips, all of whom opined that Plaintiff would be impaired in working environments because of her emotional and cognitive deficiencies. There are numerous notes from treating psychologist Dr. Phillips about instances in which Plaintiff had difficulty getting along with other people. And Dr. Phillips wrote near the end of Plaintiff's period of treatment that Plaintiff had "significant[ly] regress[ed]" in her efforts to "decrease the number and duration of angry outbursts." (Tr. at 693). The ALJ himself pointed out during the hearing that the record included many references to Plaintiff's conflicts with other people and stated that "it's a real problem." (Tr. at 806). That the ALJ later set forth as a basis for discrediting Plaintiff's testimony that Plaintiff had difficulty getting along with her therapist is difficult to explain. If anything, Plaintiff's trouble getting along with Dr. Phillips supports Plaintiff's testimony that she has trouble getting along with supervisors and others.

Moreover, had the ALJ properly considered the lay testimony from Michelle Roberson in the Daily Activities Report, he would have seen that Plaintiff's testimony about her inability to withstand the "rigor" of working was consistent with Ms. Roberson's report that Plaintiff had difficulty with concentration and memory, and that Plaintiff had been terminated from her two prior jobs because of her inability to "stay on task" and because of her tendency to prolong tasks. (Tr. at 144). Curiously, the ALJ himself became a source of evidentiary support when he noted at the hearing that Plaintiff's answers to questions were "rambling" and if "put into a work situation . . . would lead to frustration on the part of supervision pretty quickly." (Tr. at 807).

As a second basis for discrediting plaintiff's testimony about the severity of her symptoms, the ALJ noted that Ms. Ortiz finally was complying with instructions about taking her medicine and, as a result, that her symptoms were under control. The fatal difficulty with this basis for discrediting her testimony about the severity of her mental/emotional symptoms is that the medication that Ms. Ortiz was taking as directed was intended by her physician only to address her seizure disorder. There is no evidence in the record that Plaintiff ever took

or was prescribed any medications for a mood disorder, depression, anxiety, or a personality disorder, and the fact that she apparently had her seizure disorder under control would seem to have little effect on her credibility as it related to symptoms associated with entirely different medical impairments.

As the third reason for discrediting Plaintiff's testimony, the ALJ stated that Plaintiff's treating psychologist reported that Plaintiff had a sense of entitlement to constant help. It is difficult to ascertain how this note in Dr. Phillips's report undermines Plaintiff's credibility. The note made by Dr. Phillips followed a session on July 7, 2005, nearly one year after Plaintiff began treatment, and read: "[n]eed to address (entitlement) for constant need for help." (Tr. at 691). Without knowing exactly why the ALJ relied on this note to discredit Plaintiff's testimony, we can only surmise that Judge Rector somehow concluded (or assumed) that Plaintiff's application for SSI benefits was driven by this apparent sense of entitlement rather than by real medical need. One of the problems with such reasoning is that there is no evidence in the record to support the notion that Plaintiff was lying about her physical or mental impairments. To the contrary, there is ample support, provided by three licensed psychologists (who examined or treated Plaintiff), that Plaintiff suffers from more than one psychiatric disorder. Moreover, if anything, the note by Dr. Phillips that Plaintiff believes she is entitled to constant help actually supports the clinical diagnoses of mental impairments and is fully consistent with Plaintiff's testimony that she could not withstand the rigor that daily employment entails, has difficulty with supervisors, and is inclined to feel that she is abused on the job.

In sum, we conclude that the ALJ's decision to discredit Plaintiff's testimony and to ignore entirely the report of Michelle Roberson was not supported by substantial evidence in the record. On remand, the ALJ must consider, under appropriate legal standards, Plaintiff's subjective testimony about her symptoms and how these symptoms affect her ability to work. The AJL also must consider the evidence in the Daily Activities Report submitted by lay witness, Michelle Roberson.

3.    *Substantial evidence does <u>not</u> support the ALJ's determination at Step Five That Plaintiff is Capable of Performing Other Jobs That Exist In Significant Numbers in the National Economy*

The third issue on which Plaintiff seeks review involves the ALJ's determination at Step Five that, given Plaintiff's RFC, she was capable of working in jobs (other than her former employment) that exist in significant numbers in the national economy.  On this issue we also find that substantial evidence does <u>not</u> support the ALJ's conclusion.  Our finding is informed by our conclusions, set forth above, that the ALJ committed legal error (1) by improperly rejecting the opinion of Dr. Murray and parts of the opinions of Drs. Young and Phillips in finding that Plaintiff suffered only from a personality disorder and not also from a mood disorder; (2) by failing to credit Plaintiff's testimony; and (3) by failing to consider lay witness evidence about Plaintiff's daily activities from Plaintiff's friend, Michelle Roberson. Without proper consideration of this evidence, the ALJ could not — and likely did not — arrive at the correct RFC.  And without the correct RFC, the ALJ was unable correctly to assess, with the help of the vocational expert, whether Plaintiff was capable of doing other jobs that existed in significant numbers in the national economy.

In theory, the Commission may sustain its burden at step five by posing hypothetical questions to a vocational expert that are based on a claimant's RFC.  The vocational expert may give evidence about jobs that a hypothetical employee — with the same RFC as the claimant — would be able to perform.  *See* 20 C.F.R. §§ 404.1520(f).  A vocational expert's recognized expertise provides the necessary foundation for his or her testimony, and no additional foundation is required.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1217-18 (9th Cir. 2005). The hypothetical questions posed, however, must be based on an RFC for which there exists substantial support in the record.  *Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989)

Here, Plaintiff complains that the Commission did not sustain its burden at step five because the conclusions of the vocational expert were based on a confusing series of questions, posed by the ALJ, the last and most legally significant of which was <u>not</u> supported by substantial evidence in the record.  Having carefully reviewed the hearing testimony, we

23

agree with Plaintiff that the vocational expert initially was confused about what limitations were included in Plaintiff's RFC. The ALJ asked the vocational expert to consider a situation where an employee's RFC would enable the employee to get along with supervisors and co-workers for 2/3 of the work week, but "a third of the work week she may have a problem getting along with supervisors, coworkers, and others." (Tr. at 796). With this hypothetical in mind, the vocational expert stated that: "[i]f it's occasional, and it's predictable that she will have these problems to the extent that you just indicated . . . then I do believe she would not be able to maintain work." (Tr. at 797).

After hearing the vocational expert's response to the hypothetical as originally framed, the ALJ changed one of its key elements. He told the expert not to assume that the employee would have difficulty getting along with people for about 1/3 of every day, but, instead, to assume that the employee would have no problems getting along with others for 2/3 of her time at work and only *might* have such difficulties during the remaining portions of her time on the job. (Tr. at 797-98). Under this modified set of assumptions, the vocational expert stated that the hypothetical employee "would probably be able to maintain work, but, again, I think it would depend on how many days during the week she would have these problems." (Tr. at 798). When the ALJ asked whether the type of work at issue would make a difference, the expert went on to say that "[w]ork that required mainly working with things as opposed to data and people, I think she would be more able to carry out those types of jobs." (Tr. at 799).

The expert then continued to outline for the ALJ the types of jobs, in his expert opinion, that Plaintiff could perform given the ALJ's explanation of Plaintiff's RFC as "only occasionally hav[ing] these problems, and that it may not occur daily . . . and it may only occasionally occur weekly." (Tr. at 800). The vocational expert testified that with this RFC Plaintiff could perform light, unskilled jobs, such as assembly of small products or cleaning (commercial, institutional, and residential), both categories for which the vocational expert believed there existed significant numbers of jobs in the regional and national economy.

The ALJ's questions to the vocational expert certainly were less than clear. More importantly, as we explained above, because the ALJ did not properly consider the opinions of Drs. Murray, Young, and Phillips, nor the testimony of Plaintiff or Ms. Roberson, the underpinnings of the hypotheticals he posed were inaccurate and incomplete. Given, for example, Dr. Murray's opinion that Plaintiff showed "Marked Limitation" in performing activities within a schedule, maintaining regular attendance, and in completing a normal *workday* and workweek without interruptions from psychologically based symptoms, it is not at all clear why the ALJ assumed that Plaintiff could be counted on for 2/3 of the day and *might* have trouble 1/3 of the day but not on a daily basis. Had the ALJ properly considered all of the evidence — including all of the medical opinions of Drs. Murray, Young, and Phillips; Plaintiff's testimony; and the evidence from Michelle Roberson — Plaintiff's RFC and the resulting hypothetical posed to the vocational expert likely would have been different.

It strikes us as particularly significant that the vocational expert opined that a person "would not be able to maintain work" if she would have difficulty every day getting along with others in the job setting. Because the weight of the evidence, properly assessed, clearly would support posing a hypothetical in which this limitation was in place, we certainly cannot conclude that the errors in the way the ALJ considered the evidence were legally harmless. Instead, those errors likely led the ALJ to misshape the pivotal hypothetical. *See e.g., Stout v. Commissioner*, 454 F.3d 1050 (9th Cir. 2006) (prejudicial errors are not harmless).

The vocational expert's testimony that a claimant who cannot get along with supervisors on a daily basis would be unemployable also is entirely consistent with Ninth Circuit precedent holding that "substantial gainful activity means more than merely the ability to find a job and physically perform it; it also requires the ability to hold the job for a significant period of time." *Gatliff v. Commissioner of Social Sec. Admin.*, 172 F.3d 690 (9th Cir. 1999). "Indeed, the SSA considers jobs that end within three months because of the claimant's impairments to be 'unsuccessful work attempts,' and does not consider such

short-term jobs as evidence of an ability to engage in substantial gainful activity." *Id.* (citing SSR 84-25).

Accordingly, we must find that on the current record the Commission did not meet its burden at Step Five, and that substantial evidence does not support the ALJ's conclusion that Plaintiff is not disabled. On remand, taking into consideration the complete opinions of Drs. Murray, Young and Phillips and, in particular, their opinions that Plaintiff suffered from a mood disorder and would have significant impairment in the workplace, the ALJ must re-assess under Step Five whether Plaintiff is capable of working in other jobs existing in significant numbers in the national economy.

CONCLUSION

The administrative record shows that the ALJ made significant legal errors in rejecting the opinion of Dr. Dwight Murray, in ignoring significant aspects of the opinions of Drs. Young and Phillips, and in posing to the vocational expert a hypothetical whose key element the record could not support. The ALJ also erred by discrediting Plaintiff's testimony and by failing to consider evidence from a lay witness. Thus, the ALJ's determination that Plaintiff is ineligible for SSI benefits is not supported by substantial evidence. For all of the foregoing reasons, the court DENIES defendant's cross-motion for summary judgment and GRANTS, in part, Plaintiff's request for relief by VACATING the Commissioner's decision and REMANDING the action to the Commissioner for further administrative proceedings consistent with this Order.

IT IS SO ORDERED.

Dated: May 2, 2008

_____
WAYNE D. BRAZIL
United States Magistrate Judge